ITT WORLD DIRECTORIES, INC.,
Plaintiff-Appellant,

v.

CIA. EDITORIAL DE LISTAS, S.A.
and Editorial de Guias Ltb., S.A.,
Defendants-Appellees.

No. 643, Docket 74-2367.

United States Court of Appeals,
Second Circuit.

Argued May 22, 1975.

Decided Aug. 8, 1975.

Alan Latman, New York City (Marvin S. Cowan, Jeffrey L. Rosenberg, and Cowan, Liebowitz & Latman, New York City, on the brief), for plaintiff-appellant.

Roger J. Hawke, New York City (James B. May, Thomas J. Mullaney, and Brown, Wood, Fuller, Caldwell & Ivey, New York City, on the brief), for defendants-appellees.

Before MULLIGAN, TIMBERS and GURFEIN, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered October 8, 1974 after a bench trial in a diversity action in the Southern District of New York, John M. Cannella, *District Judge,* the essential question is whether the district court erred in dismissing the complaint of an acquiring company which sought restitution of an allegedly mistaken overpayment made in connection with its acquisition of two other companies.

We hold that it did not. We affirm.

I.

In view of the comprehensive statement of facts set forth in the district court's excellent opinion,[1] we shall summarize only those facts necessary to an

1. The district court's opinion filed October 4, 1974 is not officially reported.

understanding of our ruling on the issue stated above. The facts were largely stipulated.

The dramatis personae includes:

Appellant ITT World Directories, Inc. (ITTWD) is a Delaware corporation and a subsidiary of International Telephone and Telegraph Corporation (ITT). ITTWD is engaged in the business of owning and operating telephone directory companies throughout the world.

Appellee Cia. Editorial de Listas, S.A. (CELSA) is a Panamanian corporation. Prior to July 9, 1969, it was engaged in the publication of telephone directories in Portugal, primarily through its wholly owned Portuguese corporation subsidiary, Publicacoes de Listas Telefonicas, S.A.R.L. (PLT). Prior to July 9, 1969, CELSA also owned a 92.1% interest in Bertrand (Irmaos) Limitadas (BERTRAND), a Portuguese quota company engaged in printing.

Appellee Editorial de Guias Ltb., S.A. (GUIAS) is a Brazilian corporation. It guaranteed the obligations here involved of CELSA.

Tasec-Technical Advertising & Sales Engineering Corporation Ltd. (TASEC) is a Bahamian corporation. Prior to July 9, 1969, it had management contracts with both CELSA and PLT.

Arthur Andersen & Co. (ANDERSEN) was the auditor for PLT and BERTRAND.

On July 9, 1969, ITTWD entered into an agreement with TASEC and CELSA. Under it ITTWD was to acquire CELSA's subsidiary, PLT, and CELSA's 92.1% interest in BERTRAND for an aggregate amount in excess of $8 million. Pursuant to the agreement the obligations of CELSA were guaranteed by GUIAS. The agreement provided that ITTWD would pay CELSA $5,650,000 for its interest in PLT; that ITTWD would pay CELSA 92.1% of the amount by which the $600,000 appraised value of BERTRAND's plant at Dafundo, Portugal, exceeded the plant's book value as of May 31, 1969; and that ITTWD would pay TASEC $1,850,000 for the cancellation of its management contracts with CELSA and PLT.

The instant lawsuit stemmed from another provision of the agreement. ANDERSEN was to audit the accounts of PLT and BERTRAND as of May 31, 1969 and was to deliver to ITTWD and CELSA (1) "certified balance sheets of said companies as of May 31, 1969", and (2) "a certificate setting forth the tangible net worth of said companies as of May 31, 1969" computed in accordance with a formula set forth in the agreement. Adjusting payments were to be made after the parties had received the certificate. If the tangible net worth of PLT was positive, ITTWD would pay that amount to CELSA; if it was a deficit, CELSA would pay that amount to ITTWD. The same applied with respect to BERTRAND, except that instead of a payment equal to the full amount of the certificate figure, the payment was to be only 92.1% of that figure.

The agreement further provided that the determination by ANDERSEN of the tangible net worth of PLT and BERTRAND was to be final and conclusive, unless within 20 days after receipt of the certificate by CELSA it objected in writing to ITTWD and stated what it considered to be the tangible net worth of the companies. If the disputed matter was not resolved by negotiation within 20 days after CELSA objected, the matter was to be submitted for arbitration by a second firm of auditors to be selected jointly by ITTWD and CELSA.

On August 18, 1969, ANDERSEN sent a letter to the Board of Directors of ITTWD stating that in its opinion the combined tangible net worth of PLT and BERTRAND as of May 31, 1969 was a deficit of approximately $125,000. CELSA did not receive a copy of this letter. Nor did CELSA receive any other document from ANDERSEN purporting to be a separate certificate of tangible net worth.

The only document CELSA ever received from ANDERSEN was the lat-

ter's audit of the combined balance sheets of PLT and BERTRAND. This was dated August 12, 1969 but actually was delivered to ITTWD and CELSA subsequent to September 1, 1969. In its report which accompanied the balance sheets, ANDERSEN noted two exceptions to what was described as the "stockholders investment" (or net worth) of 14,062,780 Portuguese escudos ($492,-221). First, ANDERSEN stated that BERTRAND had not followed a consistent policy with respect to depreciation of machinery and equipment, with the result that BERTRAND's accumulated depreciation was estimated to be understated by approximately 5,000,000 escudos. Second, ANDERSEN took exception to BERTRAND's failure to establish a reserve of approximately 6,000,000 escudos to provide for payments against future profits to certain Bertrand family minority quota holders.

Nowhere in its report accompanying the combined balance sheets did ANDERSEN set forth a figure representing its opinion of the tangible net worth of PLT and BERTRAND. Taking into account ANDERSEN's two exceptions to the combined balance sheets, however, one could arrive at a positive net worth figure of 3,062,780 escudos ($138,224). This appears to be what ANDERSEN believed was the combined tangible net worth of the companies.[2] It was $353,-997 less than the combined tangible net worth according to the combined balance sheets.

On September 12, 1969, Victor Berger, Secretary and General Counsel of ITTWD, received a telex from ITT in Lisbon stating that a draft of the ANDERSEN report had been sent to ITTWD in New York. The telex further stated that the report showed a combined net worth of 14,000,000 escudos, but there was "to be considered" additional depreciation of 5,000,000 escudos and BERTRAND pensions of 6,000,000 escudos, making a "net net worth" of approximately 3,000,000 escudos. On September 16, 1969, Berger sent to ITTWD's counsel in Lisbon a telex in which it was stated:

"My understanding that payments to Bertrand minority shareholders against future profits provided for under Articles of Association may legally be stopped by us at present time. Please confirm this."

On September 17, 1969, ITTWD's Lisbon counsel replied by telex:

"Problem of Bertrand is very involved and it is not clear whether so called 'payments against future profits' can or not [sic] be legally stopped. As you know, we suggested negotiating rather than entering into legal action."

On that same day, Ted B. Westfall, Chairman of the Board of ITTWD, and Robert A. Arthur, a vice president of CELSA and TASEC, met at Westfall's office in New York City where the telex was received.

On October 23, 1969, John Morrison, accounting manager for ITTWD, prepared a memorandum for Berger setting forth calculations to determine the combined net worth of PLT and BERTRAND and the amount due for the BERTRAND plant at Dafundo "as per purchase agreement". Morrison's memorandum stated that "Net Worth Per A.A. report was 14,062,780 escudos" or $492,221. The total amount due CELSA from ITTWD, including payment for the plant, was calculated at $803,239. On October 28, 1969, Morrison advised the Treasurer's Department of ITTWD that "In accordance with ITTWD's agreement to purchase BERTRAND and PLT, ITTWD is obligated to pay CELSA $803,239 for the net worth and Dafundo plant." Morrison requested that a check be made out in that amount. On October 31, 1969, ITTWD delivered a check for $803,239 to CELSA's attorney.

On February 10, 1970, ITTWD notified CELSA that it mistakenly had overpaid CELSA the sum of $24,569 which repre-

---

2. It contrasts with ANDERSEN's net worth *deficit* statement of $125,000 set forth in its letter to ITTWD of August 18, 1969.

sented 7.9% of the amount by which the appraised value of the Dafundo plant exceeded book value. This claim eventually was settled. On July 9, 1970, ITTWD authorized release to CELSA of $450,000 of a $900,000 escrow fund which had been established pursuant to the agreement.

In July 1971, when the balance of the escrow fund was to be released to CELSA, ITTWD asserted that it mistakenly had made an overpayment to CELSA of $353,997. This represented the difference between the net worth set forth in ANDERSEN's audit of the combined balance sheets dated August 12, 1969 and the net worth which could be arrived at by deducting the exceptions noted by ANDERSEN in its accompanying report. CELSA refused to acknowledge ITTWD's claimed mistake.

On December 16, 1971, ITTWD commenced the instant diversity action in which it sought restitution of the $353,997 by which it claimed that CELSA had been overpaid in connection with ITTWD's acquisition of the two Portuguese companies for an aggregate amount in excess of $8 million.

After a bench trial, Judge Cannella filed a comprehensive, well reasoned opinion on October 4, 1974 setting forth detailed findings of fact and conclusions of law. The crux of his decision was this:

"At the trial, [ITTWD] did not present *any* facts which would establish that the overpayment of $353,997 was a mistake rather than a purposeful decision. This total failure to present proof sufficient to establish even a *prima facie* case is, of course, fatal to

[ITTWD's] claim." (emphasis in opinion).

In compliance with Judge Cannella's order, a judgment was entered October 8, 1974 dismissing the complaint as well as defendants' counterclaim.

The instant appeal by ITTWD followed.

## II.

▮▮▮▮ The district court correctly held that the applicable New York rule[3] is that set forth in the Restatement of Restitution § 20 (1937):

"A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, or for the acceptance of an offer, is entitled to restitution of the excess."

ITTWD does not challenge the applicability of this legal standard which is well established by New York decisions.[4] See, e. g., *Ball v. Shepard,* 202 N.Y. 247, 253, 95 N.E. 719, 721 (1911); *Hathaway v. County of Delaware,* 185 N.Y. 368, 370, 78 N.E. 153, 154 (1906); *Mayer v. The Mayor, Aldermen and Commonalty of the City of New York,* 63 N.Y. 455, 457 (1875); *National Bank of Commerce v. National Mechanics' Banking Association,* 55 N.Y. 211, 213 (1873). See also Williston on Contracts § 1574 (3d ed. 1970). Rather, ITTWD vigorously challenges the court's finding that it failed to sustain its burden of proof on its claim of mistaken overpayment.

The only witness who testified at the trial was Jeremy Jerram, an English ac-

---

**3.** The agreement provided that it was to be "governed by and construed in accordance with the laws of the State of New York."

**4.** CELSA urges that the applicable rule of New York law is that of reformation or rescission of a contract due to unilateral mistake. See *Eastern Freight Ways, Inc. v. United States,* 257 F.2d 703, 707 (2 Cir. 1958); *Rosenblum v. Manufacturers Trust Co.,* 270 N.Y. 79, 85, 200 N.E. 587, 588 (1936); Restatement of Contracts § 503 (1932); Restatement of Restitu-

tion § 12 (1937). CELSA argues that, since it did not know of ITTWD's alleged mistake, ITTWD is not entitled to recover the alleged overpayment. We disagree. The rule governing unilateral mistake relates to mistakes made in the formation of a contract. See Restatement of Restitution § 12, comment *a* (1937). The instant case involves a mistake in performance. In short, the rule of mistaken overpayment applies, not that of unilateral mistake in the making of a contract.

countant. Called as a witness by ITTWD, Jerram had been employed by ANDERSEN at the time of the audit of PLT and BERTRAND and was in charge of that audit. Since he was not employed by ITTWD when the October 31, 1969 payment was made, he did not testify regarding the allegedly mistaken overpayment by ITTWD. Much of Jerram's testimony related to the preparation of ANDERSEN's August 12, 1969 report which accompanied its audit of the combined balance sheets of PLT and BERTRAND.

■ The most significant part of Jerram's testimony, in the view of the district court, was that Arthur, the chief negotiator for CELSA in the acquisition, expressly had disagreed with ANDERSEN's conclusion that BERTRAND's net worth was overstated as a result of inconsistent methods of equipment depreciation and its failure to establish a reserve for future payments to minority quota holders. Jerram's testimony, as the court analyzed it, raised the possibility that in fact there was a bona fide dispute between ITTWD and CELSA as to the tangible net worth of PLT and BERTRAND. If ITTWD had taken into account ANDERSEN's exceptions, then CELSA would have objected to the figures. Further negotiation and arbitration would have been necessary. ITTWD's payment of the full amount therefore may have been the result of a conscious decision to avoid such time-consuming procedures rather than a mistaken oversight. The court's analysis, moreover, was bolstered by the fact of Berger's knowledge of the contents of the ANDERSEN report of August 12, 1969 as reflected in the telexes of September 12, 16 and 17, 1969.

On this critical aspect of the case, the court made this significant observation:

"In light of this knowledge on the part of Mr. Berger, and in light of the dispute as to the proper amount due and owing CELSA, plaintiff must do more than allege a mistake in their complaint and leave it at that. Some proof must be brought forth which would explain how it happened that between [September 12, 1969], when Mr. Berger received the above-mentioned telex, and October 23, 1969 when he received a memorandum from his Accounting Department stating that 'As per purchase agreement' the 'Net worth Per A. [Arthur] A. [Andersen] report' was 14,062,780 (escudos) [$492,221].' . . . he forgot the contents of the earlier telex and did not notice that Mr. Morrison had made a 'mistake' which would cost ITTWD $353,997. Plaintiff, however, failed to present to this Court any evidence, either documentary or testimonial, which could be said to support their contention that the payment to CELSA was made under a mistake of fact."

The gravamen of ITTWD's contention is that the court erroneously allocated the respective burdens of proof as between ITTWD and CELSA. It argues that it established a prima facie case of mistaken overpayment by the following "uncontroverted" facts: (1) that the amount of the payment in question was to be based on the combined net worth of PLT and BERTRAND in the opinion of ANDERSEN; (2) that in the opinion of ANDERSEN that figure was approximately 3,000,000 escudos; (3) that Morrison, ITTWD's accounting manager, prepared a memorandum stating that the "Net Worth Per A.A. report was 14,062,780 escudos"; and (4) that ITTWD paid on the basis of that figure of 14,062,780 escudos. ITTWD concludes that it sustained its burden of proof by establishing the amount that it paid (14,062,780 escudos or $492,221) and the amount it should have paid (3,062,780 escudos or $138,224). We disagree.

The flaw in ITTWD's syllogism is that it rests on the premise that the payment was to be based on the opinion of ANDERSEN as to the combined net worth of PLT and BERTRAND. This ignores the specific language of the acquisition agreement which provided that ANDERSEN was to deliver a "*certificate* setting forth the tangible net worth of said com-

panies as of May 31, 1969" (emphasis added). No certificate was ever delivered to CELSA. ITTWD understandably has not attempted to rely on the certificate it alone received which indicated a deficit of $125,000. In short, the infirmity of ITTWD's position is that, without the required certificate of net worth, it cannot demonstrate that in fact there was an overpayment.

True, Jerram testified that as an accountant he could read the ANDERSEN report of August 12 to indicate that in its opinion the combined tangible net worth of the two companies was approximately $138,000. But he also admitted the obvious: that nowhere did ANDERSEN set forth this figure of $138,000 as the net worth of the companies.

As the district court pointed out, Jerram testified that Arthur, CELSA's chief negotiator, disputed ANDERSEN's exceptions to the combined balance sheets. This disagreement is reflected in the fact that ANDERSEN merely noted in its report its exceptions to the balance sheets and did not incorporate the exceptions in its audit of the balance sheets. If ANDERSEN had incorporated its exceptions in its audit or had certified a net worth of $138,000, CELSA undoubtedly would have objected. Then under the terms of the acquisition agreement, negotiation and arbitration—possibly a new audit— would have followed. Under the guise of seeking restitution, ITTWD should not be permitted to avoid the arbitration that would have taken place at that time. But even on ITTWD's theory that the ANDERSEN report established a net worth of $138,224 and that ITTWD paid out $492,221, that would establish only overpayment. It would not establish *mistaken* overpayment. That is what this case is all about.

Moreover, this is not a case where the record is devoid of an explanation of the overpayment other than mistake. Rather, ITTWD's only witness, Jerram, testified that CELSA did not agree with ANDERSEN's conclusion that the two deductions from net worth were necessary. This testimony, as the court observed,

suggests that ITTWD expected CELSA to dispute the deductions and to seek arbitration if a certificate incorporating such deductions was delivered by ANDERSEN.

The telexes show that ITTWD was well aware of the net worth deductions proposed by ANDERSEN. They also established that ITTWD was not certain that the minority BERTRAND quota holders could prove their claims. ITTWD therefore was in doubt as to whether a reduction in BERTRAND's net worth was proper. Nor can we overlook the fact that on the very day that Arthur met with Westfall in New York City a telex was received by ITTWD in New York City suggesting negotiation of the question of payments to the minority BERTRAND quota holders.

Finally, it is nothing short of incredible that ITTWD did not discover its "mistake" until one and one-half years after payment, especially since it had reviewed the payment in the interim and had found a $24,000 error in computation. If ANDERSEN had delivered the certificate called for by the agreement and CELSA had failed to object, then ITTWD would have an arguable case that it did not intend to pay more than the amount indicated by the certificate. The case before us is a far cry from that.

In short, the record before us is replete with explanations other than mistake to account for the alleged overpayment. We agree with the district court that the overpayment may well have been the result not of a mistake but of a conscious decision to avoid negotiation and arbitration. Put bluntly, for aught that appears in the record, ITTWD may well have, been willing to pay the full amount in order to expedite performance of the acquisition agreement.

We hold that the district court was amply justified in concluding that what amounted to an assertion of mistake without evidence of how the mistake had been made, who was responsible for it, and why it was not discovered until one and one-half years later, was insufficient

to sustain ITTWD's burden of proof in the light of obvious explanations other than mistake.[5]

Affirmed.

---

**5.** ITTWD cites many cases for its asserted proposition that it has established a case of mistaken overpayment. E. g., *Gulf Oil Corp. v. Lone Star Producing Co.,* 322 F.2d 28 (5 Cir. 1963); *Mayer v. The Mayor, supra*; *Manufacturers Trust Co. v. Diamond,* 17 Misc.2d 909, 186 N.Y.S.2d 917 (App. Term, 1st Dept., 1959) (per curiam); *Mutual Life Insurance Co. v. Kessler,* 25 Misc.2d 242, 202 N.Y.S.2d 92 (Sup. Ct., N.Y.Co., 1960). We agree with the district court that these cases are inapposite. In each,

there was no substantial dispute with respect to the amount to be paid. Here, obviously, there was such a dispute.

Since we agree with the district court's findings and conclusions, we find it unnecessary to reach ITTWD's argument that the clearly erroneous standard of Fed.R.Civ.P. 52(a) does not apply because the facts are largely undisputed. See *Orvis v. Higgins,* 180 F.2d 537, 539 (2 Cir.), *cert. denied,* 340 U.S. 810 (1950).