**SPINNERIN YARN CO., INC., Plaintiff,**

v.

**APPAREL RETAIL CORPORATION, Defendant.**

**No. 84 Civ. 6840 (MP).**

United States District Court, S.D. New York.

Aug. 8, 1985.

Sidney S. Korzenik, New York City, for plaintiff.

Hahn & Hessen by Steven J. Mandelsberg, New York City, for defendant.

## DECISION AND OPINION

MILTON POLLACK, Senior District Judge.

This is a diversity action by plaintiff, Spinnerin Yarn Company, against defendant, Apparel Retail Corporation, for the price of yarn ordered by and delivered to a manufacturer of finished goods, *viz.*, Stoll Industries, pursuant to a credit line made available by defendant to Stoll's yarn suppliers. Defendant counterclaims against Spinnerin for monies it allegedly paid by mistake for Stoll's account.

The case was tried to the Court at a Bench trial. Based on an evaluation of the proofs presented, including a resolution of all issues of credibility, the Court finds and concludes that the plaintiff failed to sustain its burden of proof on the complaint and the defendant failed to sustain its burden of proof on the counterclaim.

*No Proof of a Contract*

██ Spinnerin is a supplier of yarn to garment manufacturers. Apparel is a retail "off-price" buyer of garments. Stoll Industries is a knitter of garments for numerous purchasers, and is also the collective name for East Side Clothing, Metropolis Knitting, and Stoll Industries.

Spinnerin claims that Apparel breached an oral contract to pay for yarn ordered by Stoll to be fabricated into goods for Apparel. Spinnerin asserts that it delivered yarn to Stoll, at Apparel's request, and sent the purchase orders to Apparel, which repeatedly promised to sign them. Apparel has refused to pay for the yarn delivered on the purchase orders which it did not sign, claiming that the understanding of the parties, at the outset, was that it would accept only those of Stoll's orders which it had signed in advance. Spinnerin replies that Apparel's "agent", Stoll, assented to the contracts and that Apparel waived any requirement of written assent through its course of conduct.

The evidence clearly establishes that Apparel never agreed to be liable generally for the yarn purchased by Stoll. Apparel was simply one of Stoll's customers, purchasing finished garments from Stoll. There is no credible proof that Stoll ever acted as Apparel's agent or manufactured goods with yarn purchased on Apparel's account. Spinnerin's repeated attempts to find an agency between Apparel and Stoll and contracts between Apparel and Spinnerin, where none exist, have added to the confusion surrounding this relatively simple case.

The credible testimony at trial was that sometime prior to 1983, Apparel had established a $500,000 line of credit to permit Stoll to purchase material from various suppliers, e.g., Deering Milliken and others. Apparel's Chairman had extended the credit line to Stoll, which was having some financial difficulties, as a personal accommodation to Stoll's principal. If a supplier to Stoll wanted to avail itself of the Apparel-Stoll credit line, it submitted orders to Shelly Karp, Director of Manufacturing of Apparel Buying, a division of defendant, for credit approval. As Apparel approved each extension of credit to any one of Stoll's several suppliers, it reduced Stoll's available credit line accordingly.

In early 1983, Spinnerin's sales agent telephoned Karp and told him that Stoll had said that Apparel was providing credit for Stoll. The sales agent had negotiated an order with Stoll and wanted to sell it

yarn, guaranteed by the Apparel credit line. Karp told Spinnerin's sales agent to submit the order for signature so that Karp could determine whether to accept and extend credit to Stoll to enable it to the purchase yarn from Spinnerin. Both Karp and Spinnerin's sales agent testified that Apparel expressly conditioned any agreement to extend credit on Apparel's prior written acceptance and signature.

On March 9, 1983, shortly after Spinnerin discussed with Apparel the possibility of providing credit to Stoll, plaintiff's factor, Midlantic, wrote Apparel to verify the relationship between Stoll and Apparel: "Spinnerin has been calling in orders on your account for Metropolis and you have agreed to be responsible for the payment of the invoices." On March 11, 1983, Karp responded to Midlantic: "Please be advised that we will be responsible only for Purchase Orders that, myself, or an authorized representative of Apparel Buying, has signed, as we have done with all the Spinnerin orders."

The parties followed a routine procedure for securing Apparel's acceptance of each order. Stoll's executives Rossi or Kuhl would execute a purchase order with Spinnerin's sales agent; the sales agent would then forward the purchase order and contract to Karp for possible acceptance and signature and would notify Midlantic of the potential sale. (The parties also refer to these contracts as purchase orders.) Karp would then consult Apparel's Controller, Daniel Harper, to determine whether Stoll was within the contemplated credit limit; Karp's only concern in deciding whether to accept the order was whether Stoll had exceeded its credit line. If Stoll had not exceeded its credit limit, Karp would sign the contract and forward the documents to Stoll; Stoll would then verify the amount, price, color, and style of the yarn specified in the contract. If Karp did not approve the credit, the documents were also sent to Stoll, unsigned. Karp and Spinnerin's sales agent both testified that none of the documents, signed or unsigned, were ever returned directly to Spinnerin from Apparel. Spinnerin's sales agent

went to Stoll to pick up the signed contracts.

All the purchase orders accompanying the contracts had the "Metropolis" name on them and had been signed by Peter Rossi of Metropolis. Four of the contracts identified the buyer as "Metropolis Ktg c/o Apparel Buying Corp." Although the remaining contracts were on a printed form which denominated Apparel as "Buyer," Karp testified that: 1) he did not notice that the designation on the printed form was not appropriate for a guarantor of a credit line as distinct from a purchaser of yarn; 2) he did not pay attention to the printed designation on the documents when Harper brought them to him; and, 3) he was concerned only with the bottom line dollar amount. The contracts, which had been prepared by Spinnerin, did not have a line for "credit approval"; Karp signed on the line marked "Buyers Signature" to signify his approval of credit for Stoll. Indeed, Spinnerin's sales agent never testified that Apparel was the user of the yarn, although he acknowledged that Apparel was lending its credit line in the Stoll transactions. It is also worth noting that subsequent change of orders, prepared by Spinnerin and Stoll to alter Stoll's order, identified "Metropolis" (not Apparel) as the "customer."

Karp testified that on several occasions, plaintiff's sales agent called him to explain what Stoll was ordering. Karp told the sales agent that he did not care what merchandise Stoll was purchasing, but that if Stoll wanted Apparel's credit guarantee, Stoll should send the order and Karp would decide whether to sign it or not, depending on the open-to-buy credit line, and would send it back to Stoll.

In late summer 1983, Stoll apparently closed up shop. Meanwhile, Apparel was receiving late notices from Midlantic, requesting payment for yarn delivered to Stoll. Apparel refused to pay for the yarn on unsigned orders. On August 12, 1983, Midlantic wrote Spinnerin, advising plaintiff of Apparel's limited obligation to it:

"We have placed the following invoices at your risk as the customer [Apparel] advises that they did not order the goods and do not have purchase orders covering the same."

On September 7, 1983, Midlantic again wrote plaintiff:

"Apparel Buying only agreed to pay for goods where they signed the purchase orders in advance.... Please bear in mind that shipments to Metropolis do not constitute credit approvals unless you have the proper documentation.... We have no choice but to leave the Apparel Buying invoices at your risk ..."

On December 29, 1983, Karp wrote the Spinnerin, seeking to ascertain defendant's liability and informing plaintiff that its records were incomplete. Karp wrote,

"We have never assumed general liability for the debts of Metropolis/Stoll Industries. We have on occasion executed purchase orders for the purpose of ordering goods to be delivered to Metropolis/Stoll Industries and obviously we intended to be liable for such shipments; but only for such shipments made on purchase orders signed by our duly authorized officer."

The evidence clearly establishes that Apparel never agreed to supply credit for Stoll for all yarn purchased by Stoll from Spinnerin. Rather, each order was a separate offer which Apparel was free to accept or reject. Apparel said that it would accept only by signing the contracts. Spinnerin never obtained Apparel's written consent, i.e., acceptance, for the orders in this case; since no contracts existed between Spinnerin and Apparel, Apparel is not liable for the yarn. *Cf. Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (where parties intend to be bound only after a formal contract is signed, no agreement until such signing).

The Court does not credit Spinnerin's sales agent's testimony, which is at variance with the facts on numerous material issues. The sales agent testified that Karp said that Stoll was Apparel's agent; that

Stoll would knit the yarn which would be fabricated into merchandise for Apparel; that Karp and Harper directed the yarn to be shipped prior to signing a confirmation; and, that they said time was of the essence and they would sign the contracts when sent. Contrary to the sales agent's testimony, there is absolutely no proof that Spinnerin's yarn was fabricated into goods for Apparel's account. In fact, Apparel extended credit to Stoll to purchase goods from numerous suppliers to be fabricated into goods for numerous customers. Furthermore, there is no proof that Spinnerin would have been unable to receive a signed acceptance from Apparel within the time it usually took to deliver the yarn, i.e., from one to three weeks, if Apparel was supposed to send the contracts directly to Spinnerin.

Spinnerin attempts to circumvent the fact that Apparel, itself, never accepted the contracts, in writing, by arguing that Apparel accepted the contracts through its "agent" Stoll, through its failure to object in writing to the invoices, and through its conduct.

■ Spinnerin claims that defendant is liable for the unsigned orders because Stoll was Apparel's agent and acted with actual or apparent authority. The existence of apparent authority is a question of fact; the party asserting its existence must show that the principal was "responsible for the appearance of authority in the agent to conduct the transaction in question." *Ford v. Unity Hospital*, 32 N.Y.2d 464, 299 N.E.2d 659, 664, 346 N.Y.S.2d 238, 244 (N.Y.1973).

■ The testimony and documentary evidence clearly establish that Stoll was not Apparel's agent and did not have actual or apparent authority. Apparel never said that Stoll was its agent and Apparel never acted as if Stoll were its agent. Apparel simply established a $500,000 credit line for Stoll to draw upon in its transactions with numerous suppliers, including plaintiff. Similarly, there is no proof that Stoll acted as Apparel's agent; Apparel was but one

of many customers who purchased finished merchandise from Stoll. In fact, Apparel negated any inference that Stoll was its agent; Apparel told both Spinnerin and Midlantic that it would pay only for yarn which it had approved credit, in writing, in advance. In short, there is no credible evidence that Stoll had the authority to obligate Apparel to pay for the yarn and such authority was credibly denied.

█ Spinnerin also says that Apparel's written acceptance was unnecessary because, under UCC § 2–201(2), Apparel accepted the contracts and the invoices pursuant thereto when it failed to object, in writing, to them. Plaintiff misconstrues the purpose and effect of UCC § 2–201(2); that section does not make a contract where none existed. Section 2–201(2) is an exception to the general Statute of Frauds requirement of a writing for the sale of goods for the price of $500 or more. Section 2–201(2) provides:

"Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) [section 2–201(1)] against such party unless written notice of objection to its contents is given within ten days after it is received."

One New York court has held,

"Failure to object in writing within ten days does not signify assent to the terms of the writing; it merely deprives the recipient of the opportunity to raise the statute of frauds as a defense. Therefore it is for the trier of fact to determine whether there was or was not an oral contract."

*Pecker Iron Works, Inc. v. Sturdy Concrete Co.*, 96 Misc.2d 998, 410 N.Y.S.2d 251, 254 (N.Y.Civ.Ct., Queens Cty 1978). Similarly, the Seventh Circuit, applying New York law has held,

"The *only* effect of failure to object to a written confirmation of an oral offer or agreement under Section 2–201 is to take away from the receiving merchant the

defense of the Statute of Frauds. Although Section 2–201 may make *enforceable* an oral agreement which was in fact reached by the parties, it does not relieve the party seeking enforcement of the alleged oral agreement of the obligation to prove its existence."

*C. Itoh & Co. v. Jordan Int'l Co.*, 552 F.2d 1228, 1232–33 (7th Cir.1977) (emphasis in the original).

█ Plaintiff cannot rely on a transmitted confirmation of a contract that never existed and then hold defendant to the non-existent contract because defendant failed to object. Section 2–201(2) does not eliminate the requirement of mutual assent to a contract. *See E.Y. Gilkey & Sons, Inc. v. A–E Architectural Materials, Inc.*, 86 App.Div.2d 970, 448 N.Y.S.2d 290, 291 (N.Y.App.Div.1982). Apparel never assented to the unsigned orders or the invoice copies pursuant thereto and therefore cannot be bound by them.

█ Spinnerin also claims that Apparel's written consent was unnecessary because its conduct manifested its intent to be bound and thereby waived any requirement of written acceptance. In particular, Spinnerin claims that Apparel's course of conduct in negotiating a "settlement" to extend the dates of unsigned purchase orders, paying for invoices which referred to unsigned orders, and not directly returning either signed or unsigned orders to plaintiff, constituted acceptance of the contract or, alternatively, waived the requirement of written assent. Neither argument has merit.

Under UCC § 2–207(3), "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." Under all the facts and circumstances in evidence, Apparel's conduct, as a matter of fact, did not recognize the existence of a contract. For example, after Apparel investigated and determined what confirmations were signed, it voluntarily

paid Spinnerin $44,836.20. The letter accompanying the payment states,

"It is no coincidence that all of the invoices paid by this check relate to purchase orders signed by an officer of Apparel Buying Company. As you are aware, Apparel recognizes liability only for such invoices and this payment is not to be construed in any way as an admission of liability or waiver or release as to any and all unpaid invoices."

Spinnerin claims that Apparel's "acceptance" of a "settlement", extending the date on which payment for deliveries was due, was conduct obligating it to pay for all the yarn sold to Stoll. Plaintiff's sales agent wrote Karp, "Enclosed please find the list of orders from Apparel Buying, Corp., placed by Mr. Peter Rossi of Metropolis Knitting which will now have 60 days extra dating." Spinnerin claims that the fact that some of the invoices listed in the letter referred to unsigned orders is evidence of the fact that Apparel knew it was obligated to pay for unsigned orders. However, Karp testified that he did not request an extension of payment and does not know why it was extended; he says that Apparel was not buying any yarn from Spinnerin. (During the relationship, payments were made not to Spinnerin, but to Midlantic, with whom Spinnerin factored the Stoll account). The letter does not state the reason for the extension or who requested it, and does not state that Apparel requested the extension or agrees that it owes the amounts contained therein. Incidentally, the letter on which Spinnerin relies establishes that the orders were placed by Metropolis, not Apparel. Spinnerin's characterization of the "letter" as a "settlement", with or for Apparel's account, is unwarranted either by the content of the letter, accompanying documents, or testimony.

Spinnerin also claims that Apparel's payment of invoices on orders which were not returned to plaintiff proves that defendant intended to pay for unsigned orders. However, there is no proof that the payments by Apparel's former Controller Harper were intended to be an *acceptance* of *all*

the other unsigned orders; during the same period that Harper was paying some of the unsigned orders, he was *not* paying other unsigned orders. Moreover, at least one of the orders that Spinnerin claimed was unsigned, actually was signed, but simply not returned by Stoll to Spinnerin.

■ To circumvent the signature requirement, Spinnerin also relies on UCC § 2–208(3), which provides that proof of a "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." *See also* UCC § 2–209(4). However, UCC §§ 208(3) and 2–209(4) are applicable only if a contract has been established. As a matter of fact, they are of no relevance in proving the existence of a contract. In any event, as a matter of fact, under all the circumstances established by the credible evidence and reasonable inferences therefrom, Apparel did not waive the condition of a signature.

■ The issue of whether "the parties' course of performance worked a waiver of one or more terms in their contract is a question for the factfinder." *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 872 (10th Cir.1981). *See also Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F.Supp. 978, 982 (S.D.N.Y.1985). The UCC waiver provisions, UCC §§ 2–208(3) and 2–209(4), are essentially "equitable" in nature. *See T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 365 (5th Cir.1980).

In this case, there is no evidence supporting waiver through a course of conduct. Apparel made it clear that it would pay only for signed orders; the fact that it forwarded *all* orders to Stoll for verification and return does not, in any way, show that Apparel waived signature. Similarly, Apparel's payment of *some* unsigned orders and refusal to pay others cannot establish a course of performance to pay *all* unsigned orders. Moreover, there is no evidence that Apparel knew about the extension of time for payments and intended to alter its entire course of performance. In fact, the evidence shows a course of performance at variance with Spinnerin's

interpretation of the contract. Spinnerin's sales agent repeatedly retrieved signed orders from Stoll, not Apparel, while Spinnerin was continuing its performance. As already mentioned, under all the facts and circumstances, taking into consideration the credible testimony at trial, there was no waiver under the UCC.

■ Moreover, Spinnerin certainly has not proven waiver or estoppel under the common law. It has failed to adduce any proof that Apparel "intentional[ly] relinquish[ed] ... a known right," *see Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466, 410 N.Y.S.2d 274, 275, 382 N.E.2d 1136, 1137 (N.Y.1978), and therefore has not established a waiver under the common law. Neither has Spinnerin proven that Apparel is estopped from relying on the condition of a written signature. There is absolutely no proof that Apparel knew that it was paying for unsigned orders (or why it did so) or was agreeing to extend the payment terms, or that Spinnerin continued to ship yarn to Stoll because of Apparel's conduct. *See Rosenthal v. National Life Ins. Co.*, 486 F.Supp. 1018, 1023 (S.D.N.Y.1980).

Also without merit is Spinnerin's claim that Apparel hindered the performance of the condition by not responding to the purchase orders which Spinnerin sent to it. Spinnerin relies on the general rule that "[o]ne who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition." *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (en banc).

■ Once again Spinnerin's argument assumes the existence of a contract which does not exist. Absent a contract, Apparel had no obligation to Spinnerin beyond a merchant's obligation to act in "good faith." In any event, there is no evidence that Apparel acted other than in good faith, much less that it hindered Spinnerin's performance. Apparel did only what it told Spinnerin that it would do: namely, to consider whether to accept the orders under the established credit line and then return them to Stoll. Spinnerin has not proved

that any "breach was the result of defendant's fault," *Wagner v. Derecktor*, 306 N.Y. 386, 391, 118 N.E.2d 570 (N.Y.1954), or that defendant made impossible the performance sought, *Patterson v. Meyerhoffer*, 204 N.Y. 96, 97 N.E. 472 (N.Y.1912) (although defendant knew plaintiff intended to purchase land to sell it to defendant, defendant bought the property before plaintiff could do so).

In short, Apparel neither agreed to extend credit on the unsigned purchase orders, nor waived the requirement of a writing, nor hindered Spinnerin's performance. Spinnerin is not entitled to recover.

*The Counterclaim—No Proof of Mistake*

Apparel alleges that it mistakenly paid on unsigned orders and is entitled to recover those monies from Spinnerin. Apparel claims that after its Controller, Harper, left the company, it began investigating the accounts and transactions between the parties; and thereafter, its successor Controller, Steven Kravetz, concluded that money was erroneously paid by Harper to Spinnerin on unsigned orders.

■ Under New York law, " '[a] person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact ... is entitled to restitution of the excess.' " *ITT World Directories, Inc. v. Cia. Editorial de Listas, S.A.*, 525 F.2d 697, 700 (2d Cir.1975), *quoting* Restatement of Restitution § 20 (1937). However, a voluntary payment "under mistake of law, but with a full knowledge of all the facts, cannot be recovered." *Adrico Realty Corp. v. City of New York*, 250 N.Y. 29, 32, 164 N.E. 732 (N.Y.1928).

■ In this case, the conclusory testimony of its witnesses is not sufficient to sustain Apparel's burden of proof of mistake. Kravetz, Harper's successor as Controller, testified that he did not know the "facts and circumstances" surrounding the payments. Similarly, Karp testified that he had only "limited knowledge" of the alleged error. Thus, the record is devoid of any proof as to why the questioned pay-

ments were made, whether Apparel made a mistake in fact or mistake of law, or the nature of the mistake of fact. Numerous hypotheses can be advanced (e.g., perhaps the Controller, who paid the invoices, failed to check with Karp to determine if the latter signed the orders); but, such hypotheses are not proof of mistake.

### Discovery

A question concerning the scope of discovery has been raised. The Court closely supervised the discovery in this case, in accordance with Rule 26(b)(1)(i), Fed.R.Civ.P., to the limit the parties' "unreasonably cumulative", "burdensome", and "expensive" discovery. In particular, the Court vacated Spinnerin's Request for Admissions, which consisted of 71 sections and numerous subsections, and Interrogatories, which consisted of 17 sections and numerous subsections.

Throughout this case, Spinnerin has been under the mistaken impression that Apparel kept one set of accounts, detailing its purchases from Stoll and its credit advances to that company. The uncontradicted proof is that separate accounts were kept: one group setting forth the credit advances made to Stoll's many suppliers and another setting forth Apparel's finished goods, purchased from Stoll.

The Court ordered Apparel to provide Spinnerin with a letter detailing the state of accounts between Stoll and Apparel. Apparel complied, albeit on the eve of trial by sending the letter to Spinnerin's counsel. At trial, Spinnerin claimed that the letter was incomplete. The Court gave Spinnerin's counsel the option of going to Boston (where the records are kept) to review them or to question Apparel's Controller, Kravetz; counsel chose to question Kravetz. After questioning Kravetz, counsel agreed that the matter was closed.

In any event, further discovery would be unnecessary because the nature of Apparel's accounts was fully developed at trial. Spinnerin was seeking to discover what simply did not exist—a consolidated account of all Apparel's transactions with and on behalf of Stoll.

### Conclusion

Accordingly, the Complaint and Counterclaim are dismissed, on the merits, without costs. The parties, respectively, have failed to prove the claims asserted.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

SO ORDERED.