**MIDDLE EAST BANKING COMPANY, Plaintiff-Appellee, Cross-Appellant,**

v.

**STATE STREET BANK INTERNATIONAL, Defendant and Third-Party Plaintiff-Appellant, Cross-Appellee,**

v.

**CITIBANK, N.A. and Saudi American Bank, Al-Khobar, Third-Party Defendants-Appellees.**

Nos. 680, 708, Dockets 86–7804, 86–7894.

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1987.

Decided June 4, 1987.

D. Richard Funk, Pittsburgh, Pa. (W. Gregg Kerr, Robert C. Zimmer, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., of counsel), for plaintiff-appellee, cross-appellant Middle East Banking Co.

Ira M. Millstein, New York City (Irwin H. Warren, Richard B. Friedman, Weil, Gotshal & Manges, New York City, of counsel), for defendant and third party plaintiff-appellant, cross-appellee State Street Bank Intern.

Henry Harfield, New York City (Donald L. Cuneo, Joseph F. Haggerty, Shearman & Sterling, New York City, of counsel), for

third party defendant-appellee Citibank, N.A.

Richard F. Lawler, New York City (Michael S. Zetlin, Whitman & Ransom, New York City, of counsel) for third party defendant-appellee Saudi American Bank, Al-Khobar.

John L. Warden, Melanie L. Cyganowski, Gail M. Inaba, Edward F. Duffy, New York City, of counsel, for amici curiae New York Clearing House Ass'n and Council on Intern. Banking, Inc.

Before PRATT, MINER and MAHONEY, Circuit Judges.

MINER, Circuit Judge:

State Street Bank International, defendant and third party plaintiff-appellant, appeals from a judgment entered in the United States District Court for the Southern District of New York (Owen, J.) in favor of plaintiff-appellee Middle East Banking Company ("MEBCO"). MEBCO claimed in the district court that State Street breached its contract of deposit with MEBCO. MEBCO sought recovery of one million dollars transferred by Citibank to MEBCO's account at State Street, which State Street subsequently, and without authorization, returned to Citibank. The district judge awarded MEBCO $536,601.83—an amount representing the total withdrawals MEBCO had honored against the transferred funds, and $144,133.83 in prejudgment interest. MEBCO cross-appeals from the judgment, seeking to recover the full one million dollars it originally claimed.

State Street also appeals from dismissal of its complaint against third party defendants Citibank and Saudi American Bank, Al-Khobar ("SAMBA"). State Street asserted claims for indemnification or contribution, contending that the third party defendants improperly had induced the return of the funds in question through use of interbank electronic funds transfer rules. State Street also asserted claims of tortious conversion against both Citibank and SAMBA, and brought actions for breach of contract, misrepresentation, and money had and received against Citibank. Concluding that no wrongful inducement had occurred, Judge Owen dismissed all third party claims against Citibank and SAMBA.

We affirm as to the finding of State Street's liability to MEBCO and as to the dismissal of the third party complaint. We vacate and remand for recalculation of damages awarded to MEBCO.

## I. BACKGROUND

MEBCO is a commercial banking corporation whose principal place of business is Beirut, Lebanon. MEBCO maintains an account at the New York City branch of State Street Bank. At the time this dispute arose, one of MEBCO's clients was Abdullah Saleh Al-Rajhi ("Al-Rajhi"), a Saudi Arabian currency exchange house. Al-Rajhi purchased and sold foreign currency in Lebanon and Saudi Arabia, and it maintained two checking accounts at MEBCO's main office in West Beirut—one in United States dollars, the other in Lebanese pounds. Because MEBCO did not extend overdraft privileges to Al-Rajhi, it required that Al-Rajhi's withdrawals be offset by a corresponding deposit in U.S. dollars. In early June 1982, Al-Rajhi agreed to transfer one million U.S. dollars to MEBCO's New York City account at State Street Bank, ostensibly to have funds available in Beirut to meet local payroll needs in Lebanese currency. In return, MEBCO agreed to credit the equivalent amount in Lebanese pounds to Al-Rajhi's Beirut account.

Pursuant to this agreement, on June 7 Al-Rajhi instructed SAMBA, with whom it maintained an account, to transfer one million dollars to MEBCO's account at State Street. Later that day, SAMBA debited Al-Rajhi's account and cabled instructions to Citibank—SAMBA's correspondent bank in New York City—to forward one million dollars to State Street for MEBCO's account. SAMBA then sent a telex to MEBCO informing it of the transfer orders cabled to Citibank. The following day, June 8, MEBCO sent a telex to SAMBA seeking confirmation of the transfer, to which SAMBA immediately responded affirmatively. MEBCO then sent a telex to State Street asking if it had received the trans-

ferred funds. State Street responded by cable later that day that no funds had been received. MEBCO, however, did not receive State Street's cable until July 29.

The lengthy delay in MEBCO's receipt of State Street's cable apparently is attributable to the Israeli army's invasion of Lebanon. The ensuing hostilities and street fighting in Beirut resulted in severe disruptions in electrical service, which prevented MEBCO from operating its automatic telex receiving equipment. It appears from the record that MEBCO received no cable traffic relevant to this action until July 29. Notwithstanding the absence of confirmation from State Street, and in contravention of its own policies, on June 9 MEBCO credited Al-Rajhi's account with one million dollars in Lebanese pounds and began to honor withdrawals.

On June 8, however, a short time after SAMBA had confirmed the transfer to MEBCO for a second time, SAMBA received a telex from Al-Rajhi instructing SAMBA either to stop payment of the one million dollars or to retrieve the funds. Pursuant to Al-Rajhi's order, SAMBA telephoned and sent a telex to Citibank's Middle East Department in New York on the morning of June 9, requesting that the payment be stopped. In spite of its assurances to MEBCO the previous day that the transfer had occurred, SAMBA did not notify MEBCO of Al-Rajhi's stop payment order at any time. Although the transfer order had been entered into Citibank's computer, the message had not yet been sent to State Street nor had it been released by Citibank into the Clearing House Interbank Payment System ("CHIPS");[1] in fact, the payment was not released into CHIPS until mid-afternoon. Therefore, although SAM-

BA's stop payment order could have been honored at the time it was received, the Citibank employee to whom it was referred mistakenly believed that the transfer to State Street already had occurred. As a result, no attempt was made to prevent the transfer and the payment was released through the CHIPS system later in the afternoon of June 9. Upon receipt of the payment, State Street credited MEBCO's account.

On June 10, the following day, Citibank attempted to retrieve the funds it erroneously transferred over SAMBA's stop payment order by sending a telex to State Street. Citibank informed State Street that the funds had been sent "in error" and extended an offer to indemnify State Street and to "assume all liabilities and responsibilities in accordance with the CIB [Council on International Banking] approved guarantee format."[2] State Street received the telex that afternoon and immediately sent a cable to MEBCO informing it of Citibank's request and seeking authorization to return the funds. Receiving no response, State Street again cabled MEBCO the following day—Friday, June 11. A similar cable was sent to MEBCO on Monday, June 14. MEBCO received none of these messages until July 29.

On June 16, although State Street had received no response to any of its cables to MEBCO, State Street's General Manager, Frank Sebestyen, instructed Ms. Napier of his staff to return the funds to Citibank and to retain the indemnification offered by Citibank in its June 10 telex. Accordingly, Napier debited MEBCO's account by one million dollars and retransferred the funds to Citibank through the CHIPS system. She also sent a cable informing MEBCO of

---

**1.** The Clearing House Interbank Payment System ("CHIPS") is a computerized funds transfer system used to process a large number of payments between banks. At present, there are 140 bank participants in the CHIPS system, and the participants are bound by the CHIPS Rules and Administrative Procedures as well as the Council on International Banking Compensation Rules. *Amicus* Brief at 3–4. Each day, an average of 110,000 interbank transfer payments totaling more than $400 billion are effected through CHIPS. *Id.* at 3.

**2.** The Council on International Banking ("CIB") appeared as *amicus curiae* in this appeal. CIB is a non-profit corporation whose membership is comprised of more than 325 banks engaged in international banking activities. *Amicus* Brief at 3. The CIB has adopted rules to govern various aspects of international banking operations, including the CIB Interbank Compensation Rules, which are discussed at greater length *infra*.

the debit, which again was not received until July 29. Citibank received notice that the funds had been returned on June 16 at about 3:45 p.m., and almost immediately sent a telex to SAMBA advising it that SAMBA's account had been recredited. Later that day, however, State Street's Napier made a critical error. In contravention of Sebestyen's instructions, she sent a telex to Citibank that, in addition to confirming the retransfer, released Citibank from its indemnity. By the time Citibank received the release the following morning, Al-Rajhi already had withdrawn the one million dollars from SAMBA. Shortly thereafter, Al-Rajhi became insolvent.

In Beirut, MEBCO had been honoring Al-Rajhi's withdrawals of funds in Lebanese pounds since June 9, and by July 29—the date MEBCO finally received notification of State Street's return of the funds—Al-Rajhi had withdrawn $303,320. Upon notice of State Street's actions, MEBCO immediately protested the unauthorized debit, and demanded restoration of the one million dollars. It nonetheless continued to honor Al-Rajhi's withdrawals until September 4, which by that time had amounted to an additional $89,148. In response to MEBCO's demands, State Street contacted Citibank, and in turn Citibank tried to contact SAMBA and Al-Rajhi. All attempts to secure return of the funds from Al-Rajhi were unsuccessful; Al-Rajhi was by this time mired in bankruptcy proceedings in Saudi Arabia, and its remaining assets were being liquidated under the auspices of the Saudi government.

On November 4, 1982, MEBCO instituted this diversity action against State Street in the district court. MEBCO asserted breach of contract of deposit and tortious conversion claims against State Street, seeking one million dollars in compensatory damages. In its answer, State Street denied all liability and asserted as an affirmative defense, *inter alia*, full compliance with the rules and regulations of the Council on International Banking ("CIB") and the CHIPS system. State Street also filed a third party complaint against third party defendants Citibank and SAMBA. State Street sought indemnification or contribution from the third party defendants, asserting state law claims of tortious conversion and improper invocation of the CIB and CHIPS rules. State Street also asserted claims of breach of contract, misrepresentation, and money had and received against Citibank.

A four-day bench trial began on October 28, 1985, before Judge Owen. In an unreported Opinion and Order dated July 3, 1986, the district judge rejected MEBCO's claim for one million dollars in compensatory damages, but awarded MEBCO $392,468 —the total amount of Al-Rajhi's withdrawals from June 9 through September 4. Judge Owen also awarded MEBCO $144,133.83 in prejudgment interest, for a total judgment against State Street of $536,601.83. Concluding that State Street's release of Citibank's indemnity operated to relinquish any claim State Street might have asserted against the third party defendants, Judge Owen dismissed the third party claims.

Virtually all claims asserted below are now renewed before us on appeal. MEBCO challenges the district court's refusal to award the entire one million dollars. State Street contests the district court's finding of its liability to MEBCO, and appeals from the dismissal of its third party claims against Citibank and SAMBA.

## II.  DISCUSSION

### A.  *MEBCO's Claim Against State Street*

#### 1.  *Breach of Contract of Deposit*

■ It is well established under New York law that the relationship between a bank and its customer for whose account funds have been deposited "is that of debtor and creditor, with all the legal implications that relationship connotes." *Solicitor for the Affairs of His Majesty's Treasury v. Bankers Trust Co.*, 304 N.Y. 282, 291, 107 N.E.2d 448, 452 (1952) (citations omitted). Because of this relationship, a bank "is bound by an implied contract," under which it holds the deposit to be disbursed only in conformity with the customer's instructions, *Gibraltar Realty Corp.*

v. Mount Vernon Trust Co., 276 N.Y. 353, 356, 12 N.E.2d 438, 439 (1938), and only upon the customer's order, Stella Flower & Feed Corp. v. National City Bank, 285 A.D. 182, 184, 136 N.Y.S.2d 139, 142–43 (1st Dep't 1954), aff'd, 308 N.Y. 1023, 127 N.E.2d 864 (1955). See New York State Ass'n of Life Underwriters v. Superintendent of Ins., 37 A.D.2d 304, 307, 325 N.Y.S.2d 172, 175 (3d Dep't 1971), aff'd, 30 N.Y.2d 746, 333 N.Y.S.2d 173, 284 N.E.2d 157 (1972). Returns and refunds to a third party that are unauthorized by a customer give rise to an action against the bank, Payne v. White, 101 A.D.2d 975, 976, 477 N.Y.S.2d 456, 458–59 (3d Dep't 1984), and unilateral actions of this nature are undertaken by a bank at its own peril. Gibraltar Realty, 276 N.Y. at 358–59, 12 N.E.2d at 440. In an action brought by a bank customer for breach of a deposit contract, it is no defense that the funds in question were deposited in the account by a third person. 9 N.Y. Jur. 2d Banks § 353, at 589 (1980).

Applying these principles to the facts before us, we see no reason to disturb Judge Owen's ruling in favor of MEBCO on its breach of contract claim. State Street received from Citibank a wire transfer for MEBCO's account on June 9. State Street properly credited the account and cabled its customer to inform it of the deposit. In disregard of its contractual obligations, however, State Street subsequently debited MEBCO's account and returned the funds to Citibank without authorization or permission from its customer to do so. We think it clear, therefore, that State Street breached its contract of deposit with MEBCO and we affirm Judge Owen's finding of liability.

### 2. The Measure of Damages

■ In accordance with his finding of liability to MEBCO, Judge Owen entered judgment against State Street for $536,-601.83. This damage award was comprised of two elements: $392,468, the total amount of withdrawals made by Al-Rajhi from June 9 through September 4, and $144,133.83 in prejudgment interest. MEBCO appeals from this judgment, contending that it is entitled to the entire one million dollars in compensatory damages it originally claimed. This argument is without merit.

Compensatory damages, by their very nature, are awarded to make a plaintiff whole, and they are restricted in amount to the actual losses sustained. Western Geophysical Co. v. Bolt Assocs., Inc., 584 F.2d 1164, 1172 (2d Cir.1978); Perma Research & Development v. Singer Co., 542 F.2d 111, 116 (2d Cir.), cert. denied, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). It is beyond dispute that New York requires injured parties to take reasonable steps to minimize damages, Air et Chaleur, S.A. v. Janeway, 757 F.2d 489, 494 (2d Cir.1985); Mayes Co. v. State, 18 N.Y.2d 549, 554, 277 N.Y.S.2d 393, 397, 223 N.E.2d 881, 883 (1966), and "[n]o recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures." Wilmot v. State, 32 N.Y.2d 164, 168–69, 344 N.Y.S.2d 350, 353, 297 N.E.2d 90, 92 (1973) (quoting 25 C.J.S. Damages § 33, at 698 (1966)).

Because of the power disruptions in Beirut, MEBCO did not receive notice that State Street had returned the funds to Citibank until July 29, by which time Al-Rajhi had already withdrawn $303,320. Despite this knowledge of State Street's debit, however, MEBCO continued to honor Al-Rajhi's transactions until September 4. Al-Rajhi's post-notice withdrawals amounted to an additional $89,148—an amount Judge Owen included in the judgment against State Street. In light of the well-established duty to minimize losses upon notice of defendant's breach, MEBCO's recovery should have been limited to those withdrawals it honored before learning of State Street's unauthorized debit. The district court improperly allowed MEBCO to recover the withdrawals occurring after July 29, and the judgment awarded MEBCO must be reduced accordingly.

■ Where damages are sustained in foreign currencies, New York courts apply the "breach-day rule." Simon v. Electrospace Corp., 28 N.Y.2d 136, 145, 320 N.Y.

S.2d 225, 232, 269 N.E.2d 21, 26 (1971); *Parker v. Hoppe*, 257 N.Y. 333, 341, 178 N.E. 550, 552 (1931). Under the breach-day rule, the appropriate measure of damages is "the equivalent of such [foreign currency] in terms of dollars, at the rate of exchange prevailing at the date of breach...." 36 N.Y. Jur. 2d *Damages* § 46, at 77 (1984) (footnote omitted). In other diversity actions involving New York law, we consistently have applied the breach-day rule to make a plaintiff whole by providing compensation in U.S. dollars for the actual value of the foreign losses as of the date they were sustained. *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 138 (2d Cir.1986); *Competex, S.A. v. Labow*, 783 F.2d 333, 334 (2d Cir. 1986); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865–66 (2d Cir. 1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).

Inasmuch as MEBCO incurred losses in Lebanese pounds, which it now seeks to recover in U.S. currency, damages must be calculated by looking to the exchange rate in effect on the date MEBCO honored each withdrawal. It is not apparent from the record before us that the district judge calculated damages in accordance with the breach-day rule. Therefore, as we have instructed in the past, *see id.* at 865 n. 6, the district court must determine the value in American currency of the withdrawals as of the date each was honored.

B. *State Street's Claims Against Citibank*

In its third party complaint against Citibank, State Street sought indemnification or contribution by asserting state law claims of tortious conversion, breach of contract, misrepresentation, and money had and received. These claims are predicated primarily upon State Street's construction of Citibank's June 10 offer of indemnification in exchange for return of the funds. State Street contends that the offer constituted a representation by Citibank that it was invoking Rule IV of the CIB Interbank Compensation Rules, which State Street maintains is inapplicable to the transaction. State Street reads Rule IV to apply only to those situations where funds have been sent to the wrong bank, and maintains that it would not have returned the funds had it known that the transfer was made over a stop payment order. The premise of State Street's claims, therefore, is that Citibank improperly induced return of the funds by misrepresenting the nature of its underlying mistake. Citibank responds that it did not invoke Rule IV, that State Street's construction of the June 10 telex is insupportable, and that the offer of indemnification was properly extended. As a result of our examination of the text of Citibank's indemnity and the interbank electronic funds transfer rules, we conclude that Citibank did not invoke Rule IV, and that even if it had done so, such an invocation would not have been improper.

■ We are well aware of the paucity of judicial decisions interpreting the interbank transfer rules at issue in this appeal. We previously have held, however, that "[t]he practices associated with banking transactions can be conclusive evidence of the legal effect of those transactions." *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir. 1979). We therefore look to the comments of the CIB contained in its *amicus* brief and the trial testimony of expert witnesses to determine the general understanding within the banking community as to the effect of the rules and transactions now at issue.

Although Citibank received SAMBA's stop payment order in time to act upon it, employee errors resulted in completion of the transfer to State Street on June 9. The following day, Citibank attempted to retrieve the funds by sending a wire to State Street, offering to indemnify it against any liabilities State Street might incur. Citibank's message reads in full as follows:

ON JUNE 9, 82 WE PAID YOU DLRS. 1,000,000.00 VIA CHIPS SEQ. 3232 WITH INSTRUCTIONS FOR CREDIT TO THE ACCT OF MEBCO BANK MIDDLE EAST BEIRUT B/O ABDULLAH SALEH ALRAJHI EST, DAMMAN STOP THESE FUNDS WERE PAID TO

YOU IN ERROR, PLSE REFUND TO THE ATTENTION OF D. ZARINS, IMT/CS/DIV. 4 MENA, 16TH FLOOR STOP WE HEREBY EXTEND OUR GUARANTEE AND ASSUME ALL LIABILITIES AND RESPONSIBILITIES IN ACCORDANCE WITH THE CIB APPROVED GUARANTY FORMAT STOP REGARDS, D. ZARINS OUR EF. IMT/CS/IV 0610–8413

Plaintiff's Exhibit 8.

We observe that this message neither refers to Rule IV nor to any other CIB rule, nor does it state that the transfer was made to the wrong bank. Despite this fact, State Street maintains that Citibank's telex somehow invoked CIB Rule IV. State Street points to no authority or evidence of common usage within the industry to support its interpretation of the telex, however, and we fail to see how State Street's construction of the message can be justified.

As noted in section I of the 1982 version of the CIB Rules on Interbank Compensation, "[n]ot every possible error situation is explicitly discussed." State Street Exhibit S at 1. Presumably, State Street would have us conclude that the mere offer of an indemnity is sufficient to invoke Rule IV. We note, however, that CIB Rule V, which covers transfers made payable to the wrong account, also is predicated upon the offer of an indemnification. *See* State Street Exhibit S at 5. Further, expert witnesses testified that an offer of a guarantee is not limited to Rule IV. *See* Joint App. at 561. When asked if use of the guarantee implies that the sending bank is seeking compensation under Rule IV, one expert responded: "Absolutely not. A guarantee is separate from compensation." *Id.* at 546.

Even if we were to accept State Street's theory that Rule IV applies only when the wrong bank has received the transfer—an argument we reject *infra*—we could not conclude that an offer of the standard CIB guarantee necessarily represents that a wrong receiving bank is involved. The CIB informs us that

[n]either the CIB Compensation Rules nor the guarantee itself states that the Indemnity can only be used when a payment has been sent to the wrong bank. They include the situations where a payment was not intended to be sent at all, when the amount of the payment was excessive or insufficient, where it was sent prematurely, or where, as in this case, a payment was not intended for a receiving bank because the paying bank had incorrectly paid over its customer's stop order.

*Amicus* Brief at 18–19 (footnotes omitted). Moreover, the CIB standard form compensation guarantee allows the erring bank to designate any of the following errors: (1) payments sent for the wrong account; (2) payments sent to the wrong bank; (3) duplicative payments; or (4) incorrect amounts or overpayments. Joint App. at 662. We conclude that Citibank's offer of indemnity "in accordance with the CIB approved guarantee format" cannot be construed as an automatic invocation of Rule IV.

We note also that the force of State Street's invocation theory is tempered considerably by State Street's failure to follow the dictates of Rule IV. Under the rule, the receiving bank becomes liable to the sending bank for interest beginning on the third business day following receipt of an indemnity. State Street Exhibit S at 4. Because State Street received the indemnity on Thursday, June 10, it would have become liable to Citibank for interest as of Tuesday, June 15. State Street did not return the funds until June 16. We therefore find it difficult to accept State Street's argument that it believed Rule IV had been invoked in light of its own failure to comply with the provisions of the rule.

■ Assuming for purposes of discussion, however, that Citibank actually did invoke Rule IV, we are not at all persuaded that such an invocation would have been improper. To accept State Street's invocation theory as a valid premise for its misrepresentation claims, is to accept its argument that Rule IV properly is applied only where the wrong bank has received a funds

transfer. We are not persuaded that Rule IV appropriately may be read so restrictively.

Reviewing the actual text of CIB Rule IV as effective in 1982, we find no language restricting its application to situations involving incorrect receiving banks.[3] State Street seizes upon the parenthetical descriptive heading of the rule to support its argument that it properly applies only when payments have been sent to the wrong bank. The rule's caption reads: "IV. *PAYMENT MADE IN ERROR:* (Incorrect Receiving Bank)." State Street Exhibit S at 4. However, State Street's reliance upon the parenthetical descriptive heading is misplaced. A former CIB chairman, who was one of the primary draftsmen of the rules, testified that the parenthetical caption did not limit the rule's application: the rule "means you sent [principal] out and you didn't mean to and it doesn't matter why you didn't mean to. . . . It's not just the incorrect receiving bank." Joint App. at 491. The CIB lends persuasive support for this view as well: Rule IV "did not limit the type of bank error which might cause an unintended payment. Rather, [it was] directed towards a wide variety of mistakes that a bank may make in erroneously sending a payment to another bank." *Amicus* Brief at 18.

Moreover, State Street itself previously has construed the phrase "payment made in error" to be of broader application than it now urges upon us. State Street's complaint against Citibank alleged that

[t]he term "Payment Made in Error" . . . applies only to errors of a clerical nature on the part of a sending bank such as the making of a payment on the wrong date, or to the wrong receiving bank, or in the wrong amount, or to the proper receiving bank but for the wrong account.

Joint App. at 28. As a result, it strikes us as disingenuous for State Street now to argue that the term properly is used only where funds have been transferred to the wrong bank. There simply is no basis for State Street's newly advanced limitation of the meaning of the term, and we decline to overlook this inconsistency.

We conclude, therefore, that far from "having proved the improper use of CIB Rule IV by Citibank," State Street Brief at 22, State Street has failed entirely to demonstrate the central premise upon which its claims against Citibank are founded.

Because a negligent misrepresentation claim, by its very nature, requires as an essential element a misrepresentation of some kind, *see White v. Guarente*, 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977), and because we cannot conclude that Citibank represented that its error was in sending the funds to the wrong bank, we affirm the dismissal of State Street's negligent misrepresentation claim.

State Street's breach of contract claim against Citibank must be disposed of in similar fashion. State Street contends that Citibank breached its contractual obligations to State Street and other CIB and CHIPS participants through the improper

---

**3.** In relevant part, Rule IV provides as follows:
IV. *PAYMENT MADE IN ERROR:* (Incorrect Receiving Bank)
When one member pays another member in error, the receiving bank shall return the funds to the paying bank upon receipt of proper. indemnification. Such indemnification may be in the form of an authorized message requesting the receiving bank to debit the account originally credited in error, and to return the funds to the paying bank. The receiving bank has the right to cable the party to be debited for permission to debit its account if such permission is deemed necessary. In this event the guarantee should be released with appropriate explanation. The receiving bank will also compensate the pay-

ing bank for the value of the funds *while they remained on deposit at the receiving bank.* A receiving bank must act in the following manner within two business days following the day of receipt of a duly authorized wire or letter of guarantee.
1. Honor the guarantee.
2. Return the guarantee with appropriate explanation.
To expedite return of the principal under the guarantee, interest at the rate of 100% of the principal instead of (100% less reserves) will accrue to the requesting bank beginning the 3rd business day following receipt of the guarantee.
State Street Exhibit S at 4 (footnote omitted).

use of Rule IV. Because we are not persuaded that Citibank invoked Rule IV, much less that such an invocation would have been improper, we affirm Judge Owen's dismissal of State Street's breach of contract claim.

■ We also affirm the dismissal of State Street's claim for money had and received. To maintain such an action, New York law requires the following elements: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir.1984). In light of our conclusion that Citibank acted properly in securing return of the funds, there is no equitable consideration that would satisfy the requirements of the third element of a claim for money had and received.

■ State Street's claim for conversion is equally unavailing. Under New York law, to establish a conversion action, a plaintiff must show legal ownership of, or a superior possessory right in, the disputed property, and "that the defendant exercised an unauthorized dominion over that property, ... to the exclusion of the plaintiff's rights." *Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 500 (4th Dep't 1981). *See also AMF Inc. v. Algo Distribs., Ltd.*, 48 A.D.2d 352, 356–57, 369 N.Y.S.2d 460, 464 (2d Dep't 1975); *Independence Discount Corp. v. Bressner*, 47 A.D.2d 756, 757, 365 N.Y.S.2d 44, 46 (2d Dep't 1975). Far from having excluded any of State Street's rights, Citibank extended an indemnity that expressly offered to hold State Street harmless for any and all liabilities it might incur by returning the funds. Because State Street has demonstrated no exclusion of its rights by Citibank, its conversion claim must fail.

As a final basis for claiming indemnification or contribution from Citibank, State Street contends that its release of Citibank's guarantee should not bar recovery, and it attacks as error Judge Owen's conclusion that "by releasing Citibank's guar-

antee, [State Street] relinquished any claim it could have asserted against Citibank," Joint App. at 1022. State Street seeks to set aside the release on the basis of the unilateral mistake doctrine, lack of reliance, and its contention that, properly construed, the release was limited rather than general.

■ State Street concedes, State Street Brief at 30, that releases are valid under New York law even in the absence of consideration, *see* N.Y. Gen. Oblig. Law § 15–303 (McKinney 1978), but seeks to set aside the release under the unilateral mistake doctrine. This doctrine, however, is unavailable to State Street. While it is true that New York courts will, in some cases, rescind contracts and void releases even in the absence of fraud where unilateral mistake is established, *see* 37 N.Y. Jur. *Mistake, Accident, or Surprise* § 7, at 526–27 (1964), the mistake must be "one which is known or ought to have been known to the other party," *Assurance Co. v. Pulin*, 142 N.Y.S.2d 809, 810 (1st Dep't 1955) (per curiam). *See also Sheridan Drive-In, Inc. v. State*, 16 A.D.2d 400, 405, 228 N.Y.S.2d 576, 582 (4th Dep't 1962). State Street does not allege any knowledge on the part of Citibank that State Street's release was executed erroneously, and there is no basis in the record to assume that Citibank should have detected any irregularity.

State Street instead relies on a series of cases involving a fundamentally different kind of mistake than that now before us. *See, e.g., In re Kelleher's Will*, 19 A.D.2d 147, 241 N.Y.S.2d 275 (4th Dep't 1963) (document signed by legatee described by attorney as receipt was actually release); *Wheeler v. State*, 286 A.D. 310, 143 N.Y.S.2d 83 (3d Dep't 1955) (document signed by hospitalized wife described by ·husband as pertaining to his drivers license was actually release). These cases are inapposite; they involved mistakes as to the very nature of the documents executed, and misrepresentations by someone in a fiduciary relationship to the plaintiff. No such mistake occurred here, and Citibank hardly can be characterized as State Street's fiduciary.

■ State Street also seeks to set aside the release by arguing that, because Citibank returned the funds to SAMBA before receiving the release, Citibank can demonstrate no reliance on the release. We fail to see why Citibank should be required to do so. Reliance is a necessary element of promissory estoppel, which, in certain contexts, may serve as a substitute for consideration. *See Allegheny College v. National Chautauqua County Bank*, 246 N.Y. 369, 159 N.E. 173 (1927); 21 N.Y. Jur. 2d *Contracts* § 70, at 489 (1982); *see also* 17 Am. Jur. 2d *Contracts* § 89, at 431 (1964) ("a promise is binding if the promisee has suffered some detriment in reliance thereon, even though such detriment was not requested as consideration"). As we already have noted, however, State Street concedes that under New York law, a release is valid even in the absence of consideration. We are not persuaded that Citibank must demonstrate reliance as a substitute for consideration, when consideration is not needed to enforce the release in the first instance.

Reliance and promissory estoppel go to the formation of a contract and the enforceability of a promise. *See Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (1982); *Triple Cities Constr. Co. v. Maryland Casualty Co.*, 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 295, 151 N.E.2d 856, 858 (1958). State Street's release was not an offer in solicitation of an acceptance; indeed, there was nothing for Citibank to accept. Rather, the release constituted the conclusion of a transaction, the consideration for which was Citibank's offer of indemnification in exchange for return of the funds. *See* CIB Standard Form Compensation Guarantee, Joint App. at 662. This conclusion is bolstered by expert testimony that the release is recognized as the termination of the indemnification agreement. Joint App. at 494, 563–64. In light of the foregoing, we conclude that the release is valid in the absence of consideration or any recognized substitute therefor, and that no demonstration of detrimental reliance is required to enforce it.

■ Finally, State Street attempts to persuade this court that its release must be construed as a limited release, rather than a general release, which did not extinguish its underlying claims against Citibank. Citibank's indemnity offered to "assume all liabilities and responsibilities." Plaintiff's Exhibit 8. State Street's message of June 16 informed Citibank that "today we are returning your funds via CHIPS and here by [sic] release you of your guarantee." Plaintiff's Exhibit 9. Citibank promised to hold State Street harmless if the funds were returned, and State Street subsequently released Citibank from that obligation. It is difficult to conceive of language that would be more unambiguous, and we are hard pressed to construe State Street's message as anything other than a general release.

As we previously have held, "[w]hen, as here, a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear, ... the intent of the parties [is] indicated by the language employed.'" *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) (quoting *In re Schaefer*, 18 N.Y.2d 314, 317, 274 N.Y.S.2d 869, 872, 221 N.E.2d 538, 540 (1966)). "When the words of the release are of general effect the release is to be construed most strongly against the releasor," *Mt. Read Terminal, Inc. v. LeChase Constr. Corp.*, 58 A.D.2d 1034, 1035, 396 N.Y.S.2d 959, 960 (4th Dep't 1977) (citations omitted), and the burden is on the releasor to establish that the release should be limited, *Mangini v. McClurg*, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 513–14, 249 N.E.2d 386, 390 (1969). "[T]he traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands." *Id.* at 563, 301 N.Y.S.2d at 513, 249 N.E.2d at 390. We previously have rejected State Street's claims of mistake and misrepresentation, and no other basis for invalidating the release has been asserted.

Accordingly, we see no reason to set aside the release or to interpret it in a manner inconsistent with its unambiguously plain meaning. Our conclusion is bolstered by expert testimony as to the effect of such a release within the banking industry: "The guarantee is absolute. The release is absolute in banking practice." Joint App. at 564. "The release of the guarantee is considered equally as encompassing as the guarantee itself...." *Amicus* Brief at 13. We therefore reject all challenges to the validity and scope of the release advanced by State Street and affirm Judge Owen's dismissal of the third party complaint against Citibank.

### C. *State Street's Claims Against SAMBA*

■ Judge Owen dismissed State Street's third party action against SAMBA for indemnification or contribution based on a claim of tortious conversion. As discussed previously, an essential element of conversion is a demonstration that the defendant acted to exclude plaintiff's possessory rights. *Meese v. Miller*, 79 A.D.2d at 242, 436 N.Y.S.2d at 500; *Algo Distribs.*, 48 A.D.2d at 356–57, 369 N.Y.S.2d at 464. It will be recalled that Citibank had not yet transferred the funds to State Street at the time SAMBA sent its stop payment order. Because State Street did not have possession of the funds when SAMBA acted, we fail to see how SAMBA's stop payment order in any way interfered with State Street's possessory interest. We therefore affirm Judge Owen's dismissal of State Street's claim against SAMBA.

We hasten to point out, however, that SAMBA's failure to inform MEBCO of Al-Rajhi's order to retrieve the funds, after having reconfirmed the transfer to MEBCO just hours earlier, is at best questionable behavior. Notwithstanding the impropriety of its failure to notify MEBCO, any duty incumbent upon SAMBA to notify ran to MEBCO, rather than to State Street, and State Street has neither advanced nor referred us to any recognized theory of subrogation that would permit recovery

against SAMBA. In the absence of such authority, we will not overturn Judge Owen's dismissal of the third party complaint.

### III. CONCLUSION

To summarize: we affirm Judge Owen's finding of State Street's liability to MEBCO for breach of contract of deposit; we vacate and remand MEBCO's damages award for recalculation to reflect prevailing exchange rates and the disallowance of withdrawals honored after MEBCO received notice of State Street's unauthorized debit. We also affirm Judge Owen's dismissal of State Street's third party complaint against Citibank and SAMBA.

MAHONEY, Circuit Judge, concurring in part and dissenting in part.

I join the majority in its disposition, as to liability and damages, of MEBCO's claims against State Street. I respectfully dissent, however, from the majority's disposition of State Street's claims against Citibank, and would allow State Street to recover over against Citibank the damages assessed against State Street in behalf of MEBCO. This result would moot for me State Street's claims against SAMBA, and leave Citibank to pursue any claims which it might wish to assert [1] against SAMBA.

There appears to be common ground that this case is governed by New York law, although this is assumed rather than discussed in the majority opinion and the parties' briefs, and I have no quarrel with that conclusion. It is also clear that Citibank would be liable to State Street, pursuant to Citibank's undertaking to "assume all liabilities and responsibilities in accordance with the CIB approved guarantee format" resulting from State Street's return of the $1,000,000 deposit to Citibank, but for the "critical error" (majority opinion, p. 5) of a State Street employee in telexing to Citibank a release of the quoted undertaking, in contravention of the instructions of State Street's general manager. It is further clear that Citibank did not injuriously rely

---

1. So far as we are advised, no cross-claim has been pleaded by Citibank against SAMBA.

upon the mistaken release, having transmitted the $1,000,000 to SAMBA immediately upon its receipt at Citibank, prior to receipt of the telex release. As the majority opinion states at p. 5, in fact, "[b]y the time Citibank received the release the following morning, Al-Rajhi already had withdrawn the one million dollars from SAMBA."

The question thus presented is the effect, under New York law, of the release provided by State Street in error to Citibank in these circumstances. I do not deem it necessary to track the majority's discussion of each of the legal theories advanced by State Street against Citibank, since, in my view, New York law would not give effect to the State Street release on the facts presented here, and this would be dispositive in allowing State Street to recover over against Citibank.

State Street urges that its release is ineffective under New York law on the basis of unilateral mistake. The majority, in response, cites *Assurance Co. v. Pulin*, 142 N.Y.S.2d 809, 810 (App. Term 1955) (per curiam), for the proposition that the mistake must be "one which is known or ought to have been known to the other party,"[2] and adds a "see also" citation to *Sheridan Drive-In, Inc. v. State*, 16 A.D. 2d 400, 405, 228 N.Y.S.2d 576, 582 (4th Dep't 1962).

*Assurance Co.* is easily distinguishable. There the release provision which defendant sought to avoid was "admittedly prepared and inserted in the release by someone in the office of ... [defendant's] attorney," it was "obvious that its inclusion must have been the result of discussion and request," and "the only mistake appears to be that defendant's regret that they gave up title to the stolen car now that it has been recovered." *Assurance Co.*, 142 N.Y.S.2d at 810. Under these

2. Even if this quotation stated the New York rule, it would be appropriate to inquire, as the majority does not, whether State Street's mistake must have been obvious and apparent to, and therefore was known or ought to have been known by, Citibank.

3. The majority distinguishes two cases cited by State Street, *In Re Kelleher's Will*, 19 A.D.2d 147, 241 N.Y.S.2d 275 (4th Dep't 1963), and *Wheeler*

very different circumstances, Appellate Term made the statement quoted by the majority in the form of a "proviso". As will be seen, however, this Appellate Term dictum did not accurately state New York law either then or now.

*Sheridan Drive-In* ruled in favor of a claimant who sought to set aside a release given to New York State under circumstances where the mistake in providing the release was known to the State's agents, stating that it is "universally recognized" that recovery may be had under such circumstances, but stating also that: "A mistake not mutual but only on one side may be ground for rescinding but not for reforming a contract." 288 N.Y.S.2d at 582 (quoting *Rosenblum v. Manufacturers Trust Co.*, 270 N.Y. 79, 85, 200 N.E. 587, 588, 105 A.L.R. 947 (1936)). The case is hardly authority for ruling against State Street's effort to rescind its mistaken release; although dictum, the quoted sentence squarely supports State Street's right to rescind its release and thereby recover from Citibank.[3]

Furthermore, the case quoted by *Sheridan Drive In*, *Rosenblum v. Manufacturers Trust Co.*, holds, contrary to *Assurance Co.*, that unilateral mistake may be the basis for rescinding a contract, stating:

The term "mistake" may be used to cover all kinds of mental error, however induced (3 Williston on the Law of Contracts, § 1540), and equity can interfere in a suit for cancellation or rescission to prevent the enforcement of an unjust agreement induced by a unilateral mistake of fact. A mistake not mutual but only on one side may be ground for rescinding but not for reforming a contract. (*Smith v. Mackin*, 4 Lans. 41, 44, 45; *Moffett, Hodgkins & Clarke Co. v. Rochester*, 178 U.S. 373 [20 S.Ct. 957, 44

*v. State*, 286 A.D. 310, 143 N.Y.S.2d 83 (3d Dep't 1955), on the grounds that "they involved mistakes as to the very nature of the documents executed, and misrepresentations by someone in a fiduciary relationship to the plaintiff." The cases are indeed distinguishable; there is, however, more compelling authority on behalf of State Street's position, as will become apparent.

L.Ed. 1108]). *If the erroneous transaction was such as to involve the act of the plaintiff only and the effect of the transaction would be the unjust enrichment of the defendant, the plaintiff is entitled to have the transaction rescinded, although he was the only party mistaken.* (Clark on Equity, § 372.) *Id.,* 270 N.Y. at 84–85, 200 N.E. at 588, 105 A.L.R. at 949 (emphasis added). On this reasoning, the Court of Appeals gave effect to the cancellation of a change of beneficiary in an insurance contract by a decedent where the cancellation was premised upon a mistake of fact by the decedent concededly unknown to the insurance company. To the same effect, *see Batto v. Westmoreland Realty Co.,* 231 App. Div. 103, 106–08, 246 N.Y.S. 498, 502–04 (2d Dep't 1930); *see also Metzger v. Aetna Ins. Co.,* 227 N.Y. 411, 417, 125 N.E. 814 (1920).

This court has recognized *Rosenblum* as stating the New York rule concerning unilateral mistake. See *Rickets v. Pennsylvania R.R. Co.,* 153 F.2d 757, 765 & nn. 25 & 26, 164 A.L.R. 387, 395 (2d Cir.1946); *see also ITT World Directories, Inc. v. Cia. Editorial de Listas, S.A.,* 525 F.2d 697, 700 n. 4 (2d Cir.1975); *compare Jermor Homes, Inc. v. Hoehlein,* 133 N.Y.S.2d 637, 638–39 (Sup. Ct. 1954) (quoting and applying the above passage from *Rosenblum* as stating the New York rule).

A more recent expression on this subject by the New York Court of Appeals is set forth in *DaSilva v. Musso,* 53 N.Y.2d 543, 444 N.Y.S.2d 50, 428 N.E.2d 382 (1981), where it was said:

The Trial Judge found that the "mistake was, if anything, unilateral"; the Appellate Division characterized it as a "mistaken belief by both sides." The confusion resulting from the unilateral/mutual dichotomy has been the subject of much comment ..., and it can be argued that the distinction should be abandoned.... But whether the mistake be of one or both parties, the law is that rescission is proper only when "the mistake is so material that we can see it goes to the foundation of the agreement"....

53 N.Y.2d at 551–52, 444 N.Y.S.2d at 55, 428 N.E.2d at 386–87 (citations omitted).

The more recent trend of the general case law is in the same direction, and is summarized by the following provisions of the Restatement (Second) of Contracts:

§ 153. When Mistake of One party Makes a Contract Voidable

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract *would be unconscionable, or*

(b) *the other party has reason to know of the mistake* or his fault caused the mistake.

§ 154. When a Party Bears the Risk of a Mistake

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Restatement (Second) of Contracts §§ 153 and 154 (1979) (emphasis added).

The comment under Section 153 explains the rule there stated in the following terms:

Courts have traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as to a basic assumption, if the mistake was not shared by the other party. Nevertheless, relief has been granted where the other party actually knew (see §§ 160, 161) or had reason to know of the mistake at the time the contract was made or where his fault caused the mistake. *There has, in addition, been a growing willingness to allow avoidance where*

*the consequences of the mistake are so grave that enforcement of the contract would be unconscionable. This Section states a rule that permits avoidance on this latter basis, as well as the more traditional grounds.*

*Id.* § 153 comment a (emphasis added).

Furthermore, this court, in *Albert Elia Bldg. Co. v. Am. Sterilizer Co.*, 622 F.2d 655 (2d Cir.1980) (per curiam), quoted these Restatement provisions in a case governed by New York Law and posing the question of unilateral mistake as accurately reflecting New York law. *Id.* at 657.[4]

In summary, I believe that New York courts clearly would consider whether State Street should be allowed to void the contract of release on the ground that the effect of its mistake with respect thereto is such that enforcement of the release would be unconscionable. *See,* in addition to the authorities already cited, *In Re Clark's Estate,* 233 A.D. 487, 253 N.Y.S. 524 (4th Dep't 1931); *Seidman v. New York Life Ins. Co.,* 162 Misc. 560, 296 N.Y.S. 55 (Sup. Ct.1937), *aff'd,* 253 A.D. 804, 2 N.Y.S.2d 634 (1st Dep't 1938), *aff'd,* 279 N.Y. 620, 17 N.E.2d 680 (1938).

Once the question of unconscionability is deemed open for consideration, there is little question as to the appropriate outcome. Under the majority's recital of the facts (which are in any event undisputed), the telex releasing Citibank's undertaking was sent in contravention of the explicit instruction of State Street's general manager, and arrived at Citibank after the funds had already been returned to SAMBA and withdrawn by Al-Rajhi, so that there is not even a remote suggestion of injurious reliance by Citibank. There could not be a clearer case of an obvious mistate resulting in a gratuitous windfall, lack of reliance and unjust enrichment. Under these circumstances, the releasing telex should be disregarded and the parties returned to the *status quo ante,* which would result in the reinstatement of the Citibank undertaking and judgment over for State Street against Citibank, unless there is some reason in banking custom and practice to reach a different result.

Both the district court and the majority here place substantial reliance upon banking practice and custom in deciding for Citibank on State Street's claim. The majority's invocation of expert testimony and an amicus brief, however, goes primarily to the scope of State Street's release. Since, in my view, that release is void because of State Street's mistake in dispatching it, the question of its scope becomes academic.[5] In any event, we need only decide the case before us. Whatever the situation might be in other cases and circumstances resulting from permission to withdraw a release sent via electronic payment systems such as the Clearing House Interbank Payments System, I do not see how a rule limited to the facts of this case, where no reliance or change of position by Citibank is even suggested, would have a disruptive impact on banking practices. If such instances of nonreliance would be rare, then the rule would be rarely invoked or applied, but it has the virtue of doing justice here.

As stated earlier, I see no need to consider each of the theories advanced by State Street for recovery against Citibank, since what I have already stated is, in my view, determinative of that outcome. To avoid confusion, however, a brief word is in order concerning consideration and reliance. The majority seeks to avoid the impact of Citibank's lack of reliance as follows: "[r]eliance is a necessary element of promissory estoppel, which, in certain contexts, may

---

**4.** *Albert Elia* quoted sections 295 and 296 of Tent. Draft No. 10 of the Restatement (Second) of Contracts, which provisions are substantially identical to and the predecessors of sections 153 and 154 of the final version.

**5.** It should nonetheless be noted that the statement from the CIB Amicus Brief, page 13, quoted by the majority at p. 23 of its opinion, that "[t]he release of the guarantee is considered equally as encompassing as the guarantee itself," is directly contrary to more contemporaneous evidence of the CIB's position. *See* State Street Exhibit T, Minutes of the Inquiries and Investigation Committee of the CIB held January 12, 1983. It is, of course, the CIB position at or about the time of the transaction in question, rather than some later version of that position, that is relevant to this litigation.

serve as a substitute for consideration" (majority opinion, p. 20); but since a written release can be valid under New York law in the absence of consideration, see N.Y. Gen.Oblig.Law § 15–303 (McKinney 1978), Citibank need not "demonstrate reliance as a substitute for consideration, when consideration is not needed to enforce the release in the first instance." Majority opinion, p. 907.

This rather tortured reasoning, for which no New York authority is cited, would vastly expand the operation and impact of Gen. Obl.Law § 15–303. This statute, which, together with the predecessor Section 243 of the Debtor and Creditor Law, has been on the New York statutory books since 1936,[6] provides only that a written release "shall not be invalid because of the absence of consideration or of a seal," in obvious derogation of common law rules to the contrary. The majority's application of this statute effects a rule which excepts contracts of release from the normal operation of New York contract law concerning unilateral mistake, reliance and unjust enrichment. In the fifty-one years that this quite straightforward statute has been in effect, no New York court has suggested that it has this startling impact, wholly divorced from its language and obvious purpose. Rather, as stated in *New Again Constr. Co. v. City of New York,* 76 Misc. 2d 943, 945–46, 351 N.Y.S.2d 895, 899 (Sup.Ct. 1974), "This statute was not enacted to bar legitimate claims but to facilitate release of liability without any consideration...." It is not the function of federal courts to deal in this manner with state statutes that have application in federal litigation.

Finally, the majority states that State Street's release "constituted the conclusion of a transaction, the consideration for which was Citibank's offer of indemnification in exchange for return of the funds." Majority opinion, p. 907. If the implication is that State Street's tender of a release should be analyzed as part of the performance of a prior, existing contract with Citibank, rather than as a separate contract of release, the rules thus invoked would be more favorable to State Street's position than those already stated in this dissent. As a leading authority on the law of contracts has stated:

> When a valid and enforceable contract exists between the parties and one of the parties pays money to the other in the mistaken belief that the payment is required by the contract he may recover the payment. The same rule holds true if excess payment is made. If something other than money has been transferred to the other, generally the same rule holds. The transferor may recover the value of what has been transferred, and, under proper circumstances, have specific restitution. *Relief for mistake in performance is given far more readily than in cases of mistake in formation of a contract. It matters not that the mistake is merely unilateral and that it is negligent.* Inasmuch as the contract itself defines the rights of the parties, mistaken overpayment or the equivalent clearly involves the unjust enrichment of the payee and unjust impoverishment of the payor.

J. Calamari & J. Perillo, *The Law of Contracts* 309–10 (2d Ed. 1977) (footnotes omitted). *See also ITT World Directories, Inc. v. Cia. Editorial de Listas, S.A.,* 525 F.2d 697, 700 & n. 4 (2d Cir.1975).

For the reasons stated above, I concur in the majority's disposition as to MEBCO's claims against State Street, respectfully dissent from its disposition of State Street's claims against Citibank and would allow State Street judgment over against Citibank, and accordingly do not reach State Street's claims against SAMBA.

6. Gen.Obl.Law § 1–203(27) (McKinney 1978) renders Section 15–303 thereof applicable to written instruments executed on or after April 3, 1936.